Henry and Winston *vs.* Thompson—Pronts *vs.* Manning —Harris *vs.* Cheatham—Turner and Bradford *vs.* Manning—McWhorter *vs.* Standifer—Gray *vs. Pope*, and several other cases involving the same points.

The construction of the Act of *February*, 1818, as to contracts for interest.

1. In a bond or note to pay a certain sum at a future day |with interest from the date, at 6 per cent. a month; if not punctually paid, the contract for interest from the date is a penalty. Only interest from maturity at 8 per cent. per annum is recoverable.—By five Judges, the other Judge dissenting.

2. To carry interest at a rate exceeding 8 per cent. per annum, the contract must be in writing, signed by the party to be charged, and express that it is for the loan of money, &c. and such interest is recoverable only for the stipulated time of forbearance.—Result of the opinions of four Judges, two dissenting.

THESE, and several other cases of the same description, were actions of debt or assumpsit on bonds or notes of plaintiffs to defendants in Error, of dates between the 13th of *February*, and 17th of *December*, 1819—Judgments by default, *nil dicit*, or on demurrer, had been rendered by the Courts below, for the principal and interest as expressed in the several notes, &c. The cases were all argued at the same time, the Counsel for the several parties being heard. The Reporter, for the reasons stated in the commencement of this volume, is unable to give more than an imperfect sketch of the argument. But, as the Cases have excited much attention, and have been deemed important in the jurisprudence of the State, he has thought it advisable to give such a sketch as he has the means of furnishing.

It will be unnecessary to state the several assignments of Errors. They brought distinctly into view, from the Records, the principles which were settled by the decision. One of the members of the Court had appeared in the Circuit Courts as counsel for the plaintiffs in Error in some of the Cases, and for the defendants in some others. The Counsel on both sides expressed an earnest wish that all the Judges should sit: and the Judge thus situated, attended, and gave his opinion on the principles generally involved; but did not participate in the judgments in those cases in which he had appeared as Counsel in the Courts below.

*Hutchinson*, for plaintiffs in Error—These judgments were

27

JUNE, 1824.
Henry and Win-
ston
v.
Thompson, &c;
&c. &c.

on default, nil dicit, or demurrer, for the principal and interest thereon, at $2\frac{1}{2}$, 5, and in some cases, 10 per cent. a month. The notes, &c. are of the following general descriptions :.

- 1, To pay the principal at a future day; and if not punctually paid, to pay the premium or interest as at the rate expressed; from the date, as in the Cases of *Henry* and *Whinston* vs. *Thompson*, and *McWhorter* vs. *Standifer*.

2, To pay the principal at a future day, with interest at the rate expressed, from the date, till paid—as in *Pronts* vs. *Manning*.

3d. To pay the principal at a future day, with a distinct agreement to pay the interest, not stating the time from which, or till which, it was to run—as in *Derrick* vs. *Snead's* executors.

4th. To pay the principal at a future day, with interest from the maturity of the note—as in *Gray* vs. *Pope*.

Interest on money was not allowed at common law. 3 Inst. 151. Ord on Usury, 6, 7, 31. 2d Hume's Hist. Eng. 456. 1 Amer. State Papers, 305, 6. In England, interest became recoverable by Statute 37 Hen. 8. C. 9. Here too, we are to look to our Statute Book for the right to recover interest, and at what rates at different times. These contracts depend solely on our Statute of *February*, 1818. (L. A. 443.)

Sec. 1.—That any rate of interest or premium, for the loan or use of money, wares, merchandize, or other commodity, fairly and *bona fide* stipulated and agreed upon by the parties to such contract, expressed in writing, and signed by the party to be charged therewith, shall be legal and recoverable ; and no *bona fide* contract shall be vacated, or in any manner impaired, by reason of any premium or rate of interest so stipulated and expressed.

Sec. 2.—That on all contracts, written or verbal, ascertaining the sum due, where no specific premium or rate of interest is expressed, interest shall be taken, recovered, and allowed at the rate of eight per cent. per annum, from and after said sum is due and payable.

The 3d. Section repeals all Acts contravening this.

This Statute creates the right to contract for any rate of interest, and restricts and qualifies this right. It is not every contract for any rate of interest or premium which shall be legal and recoverable. If the interest is to exceed 8 per cent. per annum, the first section of the Statute requires that the rate should be fairly and *bona fide* stipulated and agreed upon by the parties to such contract —that the contract be expressed in writing and signed by the party to be charged therewith—that the interest stipulated be for the loan of money, or for the use of

JUNE, 1824.

Henry and Winston
v.
Thompson, &c.
&c. &c.

wares, merchandize, or other commodity. Such is my reading, and on the fair principles of construction, as well as from the context, this will, I think, appear to be the correct reading. The whole contract, and not merely the rate of interest, must be expressed in writing, and signed by the party to be charged. If the words " expressed in writing" refer only to the rate of interest, the sentence is unmeaning. For how is the rate of interest to be signed by the party? The term " *use*," from the context and the nature of the subject, refers to wares, merchandize, &c., and the term " *loan*" to money. What was the object and policy of the statute? To increase the active capital of the country by affording new inducements for the loan of money. Surely not to let loose the griping and merciless creditor, to impose whatever terms he would on the unfortunate debtor who might be completely within his power. To bring the contract within the operation of the 1st Section it must be expressed in the manner, and be for such subject or consideration as this section has defined. (6 Bac. Abr. 378. 380. 391. 5 John. 327.) This is an affirmative Statute. It authorizes a new description of contracts, and the thing to be done shall not be done in any other manner than as directed. 6 Bac. Abr. 377. 395. 3 Burrow, 1890. By the Statute of Frauds, the *agreements* therein mentioned are required to be in writing and signed by the party to be charged. By the first Section of this Statute, as I have endeavoured to shew, it is required that the *contract* shall be expressed in writing and signed by the party to be charged. It has been uniformly held that the consideration is part of the agreement, and must be expressed in writing. Rob. on Frauds, 202, and cases there cited. 3 John. 211. 214. So here the consideration is part of the contract, and must be expressed in writing, and appear to be of the description required. The Statute requires that the interest, if exceeding 8 per cent. per annum, should be fairly and *bona fide* stipulated and agreed upon by the parties. Under the restrictions imposed, it appears to give a wide scope as to the power of the parties to bind themselves for any rate of interest. To bring the Contract then within the operation of the 1st Section, it should be shewn, (like all the other requisites prescribed) by proper averments in the Record, that the rate of interest was *fairly and bona fide* stipulated and agreed upon. In these Records none of the matters appear, unless it be the rate of interest or premium, expressed in the notes. And as to these, their very enormity furnishes intrinsic evidence that they were merely intended as a penalty. From the established principles of law, they can only operate as such. In

Henry and Win-
eton
v.
Thompson, &c.
&c. &c.

the case of *Eckford* vs. *Sale*, the debt contracted on the 1st of *March*, 1819, was $100. The interest adjudged at *September* Term, 1820, was $187 50. In *Turner* and *Bradford* vs. *Manning*, the debt contracted in *June*, 1819, was $3000 ; interest adjudged at *September* Term, 1821, was $3261 22. In *Otey* and *Lewis* vs. *Ewing* and *Clemens*, a debt of $4,200 was contracted on the 11th day of *June*, 1819, the note to be paid ninety days after date ; and if not punctually paid when due, to draw 10 per cent. a month until paid. Interest on this debt, according to the principle on which the judgments were rendered in the Court below, would now amount to $24,570. If no restraints whatever on contracts for interest had ever been imposed by any Statute, could any tribunal, with the feelings and principles of thinking common to all mankind, have adjudged such a premium for the use of money ? Could hire or compensation for the use of any other commodity, so far beyond all proportion to its value, be adjudged on any contract, no matter in what terms it may be expressed ? Whatever words may be used to bind the party to pay hire, at such rate, the common sense of mankind must lead to the conclusion that it was intended but as a penalty. For no man of common sense could make such a contract, under the expectation of paying hire for any length of time, at such rate. 2 Com. Con. 538. 546. 1 Poth. 207, 9, 11.

But we may be told, that it is for a Court of Equity, and not for a Court of Common Law, to relieve against a penalty. Our Statute of 1811, L. A. 464, perhaps settles this question. If the high rate of interest, as expressed in the bonds, &c. is but a penalty, the law requires the judgment to be entered but for the principal and interest due ; and this interest, by the 2d Section of the Act of 1818, is 8 per cent. per annum.

Without the aid of a Statute, Courts of Common Law have long since disregarded the penalty, and adjudged according to the direct intent of the contracting parties.

As for resorting to Equity—from the very nature of the judgments which the defendants in Error seek to enforce, it would seem to be hopeless. They do equity ! What is to be hoped for by appealing to the conscience of the usurer, who with flinty heart and iron hand watches over his helpless debtor, calculating when this rapidly accruing interest will amount to all which he can pay, and is then ready to strip a helpless family of the last bed on which disease or infancy may find repose, and the last morsel of bread which may sustain life ?

*Kelly*, on the same side—cited 2 Vernon, 209, 306. Ord.

on Usury, p. 49. 12 Mass. Rep. 365. As to the power of Courts of Common Law to cut down the penalty, a review of the cases will shew conclusively that they exercise concurrent jurisdiction with Courts of Chancery. Reeve's Dom. Rel. 300. 418, 19. 2 Cowper, 495, citing the wire-drawer's case. 1 Maddon, 27, 28. 6 Mod. 101. Roberts on Frauds, 105, 118. So in the case of lost bonds, &c. 3d Term. Rep. 151.

As to the difference between promissory notes and sealed instruments, Laws Ala. 464—70.—The last-mentioned Statute, passed in 1812, requires that in all actions founded on any writing, ascertaining the plaintiff's demand, if judgment by default, nihil dicit, non sum infirmatus, or on demurrer, be entered, the Court shall enter judgment for the debt and interest thereon ; and this interest, as we have shewn, should have been computed, under the 2d Section of the Act of 1818, at 8 per cent. per annum.

The case of *Dinsmore* vs. *Hand*, (a) decided here at the last term, is in point for us. It has been my intention to have the decision in that case published. It would have been hailed by a suffering and injured community as the harbinger of relief.

*Hitchcock*, for defendants in Error—I presume that these cases, like all others before this Court, must be determined by the law of the country, and not by giving hard names to the transactions and the parties; or by the influence of feelings which may be awakened by the contemplation of the effects of the contracts on the plaintiffs in Error. Courts of Justice give construction and effect to contracts, and respond to the questions of law arising out of the Record. The power of making contracts for the parties, or of relieving them from the mischiefs which may result from enforcing their contracts according to their unequivocal terms, has not been assigned to the judicial tribunals of this, or, so far as I am informed, of any other country.

I deny that the right to contract for interest originated with the Statute of Hen. 8, or with any other Statute. If not restrained by law, the owner of money is at liberty to contract for its use at any rate on which he and the borrower may agree, just as the owner of lands or chattels may hire them at any rate which may be agreed on. From a remote period in the history of commerce down to the present day, wherever money has been the instrument of exchange, interest appears to have been a lawful subject of contract. In the Roman empire, in *Hindostan*, and in the several countries of modern *Europe*, the rates varied ac-

(a) *ante*, 126.

JUNE, 1824.

Henry and Winston

v.

Thompson, &c. &c. &c.

cording to the commercial state of the country—in other words, according to the rates of profit from the use of money—or (like the price of any other commodity,) according to the proportion between the demand and the supply. In *Holland*, where the rate does not appear to have been restrained by law, it has been three per cent. per annum. In *New-York*, where the law fixes the highest rate at seven, it has been sometimes at 5 per cent. per annum. 2 Bl. Com. 254. 5 Gib. Rom. Emp. 477. Ord on Usury, 3—5. Addison's Rep. 477.

If the enquiry were now as to the fairness of these contracts instead of a mere question as to their construction, these high rates are not more calculated to excite surprise and exclamation than were the prices of land, of slaves, of cotton, and other property, or the profits in some instances for the use of money, for very short periods, about the time when the Statute of 1818 was enacted, or when these notes were given.

The right to contract for interest does not then originate from any Statute, but has been restrained in its exercise by the negative words of various Statutes. If the plain terms of the Statute of 1818 require the aid of rules of construction, we must enquire what was the law as to this matter at the time of its enactment? What restraints on contracts were intended to be removed by it? and What is the established, legal meaning of the terms used to express the Legislative will? 6 Bac. 383, &c. 12 Mod. 540. 2 Salk. 518.

Before the enactment of this Statute, a contract for a higher rate of interest than 6 per cent. per annum was illegal. By this Statute, any rate of interest or premium for the loan or use of money, wares, &c. fairly and bona fide stipulated and agreed upon by the parties to such contract, expressed in writing, and signed, &c. shall be legal and recoverable. Even if interest could not accrue, or be contracted for, by the common law, the contracts now under consideration are in so many words made legal and recoverable by this Statute. The principles stated in 6 Bac. 383, cited by Mr. *Hutchinson*, are in our favour. For what is the common and known import of the terms used in this Statute? The *English* Statutes and the Statutes of the several States, in restraint of interest or usury, employ terms, in describing the subject of the contract, not more comprehensive than those here used. The term loan of money, in these restraining Statutes, has always been held to include the use of money retained in the hands of the debtor. Our Statute of 1818 mentions both the loan and

use of money. The interest is here the subject of controversy. The notes signed by the parties charged, express the rate of interest stipulated and agreed upon. The contracts appear on the Record to have been fairly and bona fide made. It is not so averred; but why it should have been, in declaring on these more than on any other contracts, I am at a loss to perceive. The Statute declares that any rate of interest so expressed shall be *legal and recoverable.* And yet this Court are now called on to declare that it was illegally recovered, and that what the parties have, by their written contract, deliberately agreed to pay as interest, is not interest, but penalty ! The notes shew what the parties intended when they were given. The judgments by default and nil dicit, shew that when they were rendered the plaintiffs in Error still believed that they were bound to pay the interest which they had agreed to pay ; and the defendants in Error then believed, and yet believe, that the law and their contract entitle them to receive it.

The case cited from 5 John. 327 is on an illegal contract for the sale of Lottery tickets, and so far can have no application here ; and the same remark will apply as to the cases of corrupt loans as cited.

As to the question of penalty, where the notes are payable at a future day, with interest from the date if not punctually paid, I do not controvert the principle as settled in *Dinsmore* vs. *Hand.* The contract there was made before the Act of 1818, and could not be affected by it. Nor do I deny the correctness of the definition of penalty. It is in our favour. Were these contracts to pay the rates of interest as expressed, and made with the Statute of 1818 distinctly in the view of the parties, intended as a forfeiture annexed for the better enforcing of the payment of the principal ? To general apprehension, and according to the intention of the parties, the agreements to pay interest expressed are as clear and unequivocal as the agreements to pay the principal. Is there any room for doubt ? This agreement and intention of the parties appears as clearly in the notes to pay interest from the date, if not punctually paid, as in the others. And if this be a rate of interest or premium fairly and *bona fide* stipulated and agreed upon, and expressed, as required by the Statute, the Statute has made it " *legal* and *recoverable.*" Mr. *Hitchcock* also cited from Pothea 202, as contrasted with the matter in 204 and 206 of the same book ; and commented on the cases cited from 2 Com. on Cont. 542, &c. He also cited 4 John. 436, Cowper, 112. And to shew that interest must be recover-

JUNE, 1824.

Henry and Winston

v.

Thompson, &c. &c. &c.

ed according to the law, at the time and place of the con‚ tract, cited 2 Burrow, 1098.

*F. Jones*, for plaintiffs in Error.—If these judgments can be sustained, it must be by force of a naked Statutory provision. If not a Statute on the subject had ever been enacted, and contracts for interest had been as unrestrained as contracts for the hire of any article of property, could interest be recovered at the rates expressed here ? Could any Court of Justice enforce a contract to pay for the hire of any commodity at a rate which in a short time would amount to double or quadruple its full value. But it is contended that these contracts must be literally enforced by operation of the direct and affirmative words of the Statute. The Statute authorizes such contracts for the loan of money. Does it extend to cases of sales on credit, where the price is to be paid at maturity, with interest from the time of the contract, or interest from the date, *if not punctually paid* ? If so, there was no necessity for the Legislature to have interfered, for the parties had but to add the interest to the principal, and express in one sum the amount to be paid at maturity. Yet it will hardly be contended, that on an obligation to pay a thousand dollars in twelve months, and if not punctually paid, to pay sixteen hundred, that the sixteen hundred dollars could be recovered, even according to the technical rules of a Court of Law, and though not a Statute restraining the rate of interest should operate on the case. But this is in effect the same as an obligation to pay a thousand dollars in twelve months, and if not punctually paid, to pay interest from the date at 5 per cent. a month. As for the notes to pay interest from the date at the rate expressed, until paid—the words, until paid, according to the intention of the parties, refer to the time appointed by the contract for payment.

But interest is the creature of Statutory enactment. I will not detain the Court by an examination of the books on this subject. The authorities cited, as I think, clearly prove this position ; and it cannot be shewn, even by tradition, that interest accrued at common law.

In acknowledged cases of penalty, the contract and the expectation of the parties may have been as explicit and distinct, and as free from the restraints of any Statute, as these contracts can be. Yet if A. were to contract that he would deliver to B. in twelve months a chattel worth $100, or, in case of failure, would pay him $1000, could any Court of Justice give judgment for the penalty ? Do not the excessive and ruinous rates of interest here, in principle,

outrage the common sense and feelings of mankind as much as the case supposed? Their reflections and feelings as men must restrain Courts of Justice from adjudging at such ruinous rates. No man of feeling would exact such interest, and no correct member of the profession could enforce its collection——without feeling.

*Clay,* for defendants in Error—gave further illustrations of the positions taken by Mr. *Hitchcock.*

As to the question of penalty, Pothier has been cited. He treats of the principle according to the doctrine of the civil law, but I do not conceive that his definition of penalty differs from what is considered such at common law. In obligations acknowledged as penal, the obligee may elect to bring his action for damages, for breach of the condition, or for the penalty ; and the judgment is rendered for the penalty, to be discharged by payment of the damages, or for the principal and interest due.

By our Statute of 1811, on penal bonds for payment of money, the judgment is to be entered for no more than the principal and interest due. How could the obligees, or holders, here elect to sue for what the Counsel for the plaintiffs in Error term the penalty ? Could an action be sustained demanding this interest or penalty, as they term it, as the debt ?

From the cases cited in 2 Comyns on Contracts, 524, &c. as well as from principle, it seems clear that wherever the parties have agreed on a certain sum for doing or not doing the act contracted for, this is to be the measure of the recovery, *and not such* measure as a Jury might arbitrarily adopt. Yet they may have agreed on a sum greatly exceeding or falling short of the value of the injury done by a breach of the contract. In *Lowe* vs. *Peers,* (4 Burrow, 225,) the breach of the contract may by possibility have benefited, rather than injured the plaintiff ; but it was for the parties by their contract, and not for the tribunal called on to enforce *it, to determine on* this matter. So in *Fletcher* vs. *Dyche,* 2 Term. Rep. 32, it is obvious that the high and progressive weekly sum to be paid, might be as much out of proportion to the injury from the delay in performing the work as the interest here to the value of the use of the money ; and yet who doubts the correctness of the conclusion of the Court there, that defendant was bound to pay according to his contract ?

As to the case cited by Mr. *Kelly* from 12 Mass. 375, it is enough to say, that in Massachusetts there is no such Statute as the one on which we here rely. But it is contend-

28

Henry and Winston
v.
Thompson, &c.
&c. &c.

ed that the contracts do not come within the operation of the first Section of the Statute of 1818, unless on their face they show that the consideration was a loan, and unless it be averred in the Record that the interest was fairly and *bona fide* stipulated and agreed upon.   Can the term " use," in the Statute, by any legal or grammatical construction, be restricted to " wares, merchandize, or other commodity ?" The Section of itself furnishes the answer : " Any rate of " interest or premium, for the loan or use of money, wares, " merchandize, or other commodity, fairly and bona fide " stipulated and agreed upon by the parties to such con- " tract, expressed in writing, and signed by the party to be " charged therewith, shall be legal and recoverable ; and no " bona fide contract shall be vacated, or in any manner im- " paired, by reason of any premium or rate of interest so " stipulated and expressed."   If the punctuation of the Section can afford any aid, it supports our construction. Do not the terms " loan " and " use " apply indiscriminate-ly to the subjects of the contract as the case may be ? Would not a loan of wares and merchandize be within the Statute ?   And is not a contract for the use of money, per-mitted by the creditor to remain in the debtor's hands, equal-ly within it ?   If authority were necessary, the cases cited from Ord on Usury prove this.

Why should the averment, that the interest was fairly and bona fide made, be required in declaring on these more than on any other description of contracts ?   If the contract, as described, appears to have been fair and bona fide, such averment could have had no effect as to the testimony to be introduced by either party on the trial.   But why then, it may be asked, were these expressions introduced into the Statute ?   Obviously in order to qualify the general and strong terms " shall be legal and recoverable."   That there might be no doubt in adjudicating on contracts coming with-in the operation of this Section, that if not fairly and *bona fide* made, the same defences and means of relief would be applicable to them as to all other contracts not so made.

As to the argument from the decisions on the construction of the Statute of Frauds, compare that Statute with this, and it can weigh but little.   That Statute requires the *agree-ment* to be in writing—our Statute, so often *cited*, required that the rate of *interest* stipulated and agreed upon by the parties to such contract shall be expressed in writing.   On any fair principles of construction, can it be concluded that this Section requires that all the matter of the contract by which the minds of the parties were brought to assent to it, as well as the matter which the obligor bound himself to

JUNE, 1824.

Henry and Win-
ston
v.
Thompson, &c.
&c. &c.

perform, the consideration, as well as the rate of interest, shall be expressed in writing? The context of the Section does not, as I conceive, require it. But how stood the old law when this Statute was enacted? Interest exceeding six per cent. per annum, whether stipulated with writing or without writing, could not be recovered. It was the evident object of the Statute to remove or relax this restraint, and to leave the parties free to contract for any rate of interest, if it was fairly and bona fide stipulated and agreed upon, expressed in writing, and the contract signed by the party to be charged. If in these notes, interest at the rate of one or two per cent. per annum had been expressed, under the same circumstances as the interest here, I presume that it would hardly be contended that the specific rate of interest had not been expressed as required by the Statute; and that therefore under the 2d Section, interest must be recovered at the rate of eight per cent. per annum.

To my view the terms of the Statute, and the Statute itself, so clearly sustain the construction for which we contend, that argument in aid of that construction is very much like attempting to prove a self-evident proposition. The interest then (as I infer) being fairly and bona fide stipulated and agreed upon (for it was for the obligors or makers to show by plea that it was not so stipulated) the rate being expressed in writing, and the contract signed by the party to be charged, was made legal by the Statute, and was rightfully recovered in the Courts below.

As to the interest from the maturity of the notes till the judgments where parties have contracted for a given and legal rate of interest, the rate fixed by the contract is to govern until judgment rendered. 4 Burrow, 1098. 4 Johnson's Cases, 27. Mr. *Clay* made further comments on the cases cited from Salkeld, 519. 2 Comyn on Contracts, 24. 12 Mod. 540, &c. &c.

*Kelly* in conclusion.——I may at least say, that to my mind our positions remain unshaken by the arguments on the other side.

As to the notes on which, if not punctually paid, interest is to be paid from the date, I might perhaps say that the gentlemen on the other side abandon the contest. If, in the case of *Dinsmore* vs. *Hand*, the interest from the date, though at a rate not prohibited by law, be a penalty, so here, admitting it to be at a rate allowed by law, it is equally a penalty.

As to our position that the Statute requires not merely that the rate of interest should be expressed in writing, but

that the whole contract should be in writing, and not the half of it only, and the support which we attempt to give to it from the decisions on the import of the term *agreement* in the Statute of Frauds, I contend that the word *contract*, in our Statute, is a fair equivalent for the word agreement, especially when connected with the word "*such*" that precedes it. The words "such contract," in our Statute can only be satisfied by a contract having all the attributes required by the preceding part of the Section. It must be a contract for the loan of money—be reduced to writing, and signed by the party to be charged. It must recite the fact of the loan, as the only legal basis for the stipulation of interest; and in addition to all this, it must be fairly and bona fide made. Then, and not till then, will it be "*such contract*" as the Statute allowed to be made; and the plaintiff must aver and prove that the contract was made fairly and *bona fide* before he can recover the stipulated interest. If we go back to the intention and views of the Legislature in the enactment of this Statute, if we examine the Statute itself, can there be a doubt but that the idea of a loan of money was throughout, with the framers of the law, the governing principle? At that time, the opinion prevailed that great profits were to be made by the use of money in this country. To give to men of enterprize facilities in obtaining it, the Legislature authorized any rate of interest for such loan to be agreed for; but as a safeguard from the mischiefs of the innovation, and the abuses of the privilege, required that the contracts should be expressed in writing and signed by the party to be charged, and should shew that the rate of interest was for a loan, and fairly and bona fide stipulated and agreed upon by the parties. Can it be supposed, that if contracts, such as those now under consideration, had been presented to the view of the Legislature as coming within the Statute which they were about to enact, that any body of men, entrusted by their fellow-citizens with the power of Legislation, could let such widespread ruin loose upon the country. Surely they could not have authorized, and the Statute has not authorized, the unfeeling creditor, by a little farther forbearance to his debtor, to continue to double the debt in geometrical progression until the enormity must awaken the dullest understanding and feelings to an exclamation at the oppression of the transaction. The Statute then did not authorize contracts for interest at this enormous rate for the forbearance of a debt.

But the cases of the second class, as arranged by Mr. *Hutchinson*, have hardly even this claim to come within the

pale of the Statute. For the interest accrues from the date, and in all the cases, what consideration is there for the interest after the maturity of the debt? There is no contract for forbearance, or that the debtor shall have the use of the money after that time. The interest then, unless the contract be clearly and technically within the terms of the Statute, is judicially to be considered but a penalty. What is a penalty? This is not to be determined by the form of the security, or by Statutory restraints upon the contract, but by the gross disproportion between the sum agreed to be paid for doing or not doing the act, and the injury thereby to be sustained by the other party.

As to the Case *Fletcher* vs. *Dyche*, (2d Term R. 32), cited by Mr. *Clay*, it is a clear case of penalty; and the principle there decided cannot be law. Will any man contend that if the defendant had agreed to pay the plaintiff £10,000, instead of £10, for every week's or every day's delay until the work should have been finished, that this ruinous amount could have been legal and recoverable? Why is a penalty cut down at law? Not only because it exceeds the justice of the case; but because from the intrinsic nature of the subject, it is the incident, and not the principal matter of the contract. Mortgagees were allowed to oppress for a time, but the attention of the Courts being called to the nature of the contracts, executed them so far as justice required, and held them void as to the residue. Mortgages were engines of oppression in the hands of merciless money-dealers; and if they had met with judicial sanction, would have accumulated the property of the community in the hands of cormorant avarice and reduced the other members of society to beggary. The notes in question are engines of the same character, and wielded for the same purpose: with this difference, that the Jews were the money-dealers in the beginning of mortgages, and were already odious, and might be turned out of Court without regret; for they were even a subject of regal pillage in most countries. In England, King John put one Jew on his election between his money and his *teeth*, and drew a tooth a day until he yielded his money. Under such circumstances, the Courts had nothing to fear in fixing a boundary to oppression; but here usury has been made respectable, at least for a time, by the character and standing of the parties engaged in its *unholy* practice; and the Court that touches a hair of the head of *one of these little ones* will be denounced by the money-dealers. Allow them to oppress, and "Daniels will come to judgment."

But it has been said, that there must be a wide stretch of

judicial power to sustain our positions in this case. My remarks as to the nature and terms of these contracts are a sufficient answer to this. If we have shewn no case in print, it is because the injustice and oppression of mankind have as yet, in our civil or judicial history, presented no contracts corresponding with these in enormity and oppression. If the harmony of society and the rights and happiness of its members, are to be protected by those who administer the laws intended for the equal protection of all, judicial remedies must of necessity keep pace with fraudulent ingenuity ; and if these be the first cases presented for adjudication, in which the merciless hand of wealth and power attempts, under the guise of law, to grind its victim into dust, it is surely time that a new precedent should be made which will put a stop to the work of ruin.

If these contracts are not within the Statute, there is no justice to invoke to their aid, and of course they cannot be executed. The Act of 1818 is their warrant, and they must pursue it strictly. If they fail to do so, and a victim should escape, justice could not weep. Indeed, it might be said that " God had tempered the heart to the shorn lamb."

They have not shewn that the notes were given for money lent, and no other consideration will sustain the stipulated interest. They have not shewn by averment that the contracts were made *fairly and bona fide ;* and of course they cannot recover, unless those words in the Statute can be spunged out as useless and unmeaning. The defendants could defend against a fraud without them, and it must have been for some other purpose that they were inserted. The meaning we assign them is the only useful one that can be given. Put the *onus* on the *shaver*—make *him* aver and prove the fairness of his contract, and it will amount to a safeguard against the boundless extent of his merciless exactions. A Jury would then have to pass upon the fairness of his contract, and find it affirmatively, before he could recover more than 8 per cent. for his interest. The competency of the Jury to make such an enquiry is conceded, if the defendant should raise the question by a plea : and it follows that they are just as competent to make it, if the plaintiff should be required to aver and prove it as the foundation of his claim to stipulated interest. The common sense of mankind, in most cases, could be relied on—an advantageous bargain, obtained from a drunken man by artifice, would be denounced as unfair.

Juries actually do decide on the descriptive attributes of contracts and of crime in many cases. Every suit arising out of the achievements of a horse jockey furnishes a sample.

and attests the capacity of the Jury for such an enquiry. Murder must be committed with malice aforethought; and larceny, feloniously. These attributes are not sworn to by witnesses as existing facts, but are drawn by the Jury as matters of inference from facts established by proof. The fairness of such contracts would depend on the relative situation of the parties. If undue advantage should be taken of the embarrassments of the borrower to extort from his sensibility more than a reasonable compensation for the loan, the contract would be unfair. The very enormity of these exactions is of itself proof of the unfairness of the contracts, and of the undue advantage taken of necessity. The plaintiffs have not averred their fairness, and of course they cannot recover. Will the Court remand to allow them to amend in that particular? Surely not; for justice does not require it. The Court will reverse for the Errors apparent, and render judgment for as much as the plaintiffs are entitled to have by the Record as it stands, and no more. They will "give to Shylock his pound of flesh, but not one drop of human blood."

June, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

The Judges delivered their opinions.

The Chief Justice.—The amount in controversy, the variety of principles involved, and the extraordinary efforts of the Counsel, combine to give to these cases a degree of importance not as heretofore attached to any cause in this Court; but with the state of public excitement or of public opinion as to the result, we have here nothing to do—as little have we to do with the hardships of these contracts, or the merits or demerits of the parties. We owe it to our consciences, to a liberal profession, and to an intelligent and virtuous community, to decide these cases, and all others which may come before us, according to the known principles and rules of law.

The first question in the investigation is, What is the true construction of the Statute of 1818 entitled " An Act to amend an Act against Usury," the first section of which is in these words: " That any rate of interest, or premium for " the loan or use of money, wares, merchandize, or other " commodity, fairly and *bona fide* stipulated and agreed up- " on by the parties to such contract, expressed in writing, " and signed by the party to be charged therewith, shall be " legal and recoverable; and no *bona fide* contract shall be " vacated, or in any manner impaired, by reason of any " premium or rate of interest so stipulated and expressed." The fair rule of construing a Statute is, to consider what was the law before its enactment, and what the remedy in-

JUNE, 1824.

Henry and Win-
  ston
 , v.
Thompson, &c.
 &c. &c.

tended to be advanced. The second Section of the Act of 1805 entitled " An Act against Usury," enacts " That if " more than the rate of six dollars for the forbearance or " giving day of payment of one hundred dollars for one " year, and after that rate for a greater or less sum or for a " longer or shorter time shall be taken, accepted, or received " by way of any corrupt bargain, loan, exchange, or interest " of any money, wares, merchandize, commodities or other " things bought or sold, the same, together with the whole " amount of interest taken, accepted or received therewith, " may be recovered by any person paying the same, by ac- " tion of trespass on the case with costs of suit." ₁Laws Ala. p. 443.) The old law restrained the *taking* of interest on any contract whatever at a greater rate than six per cent. per annum. The words used include not only the loan of money, but every article that could possibly be made the subject of a contract. The Statute of 1818 was in- tended to remove the restriction either *partially* or *wholly*— to leave the parties at liberty to stipulate for any rate of in- terest on any contract, without reference to its consideration, or to leave them so at liberty only as to particular subjects of contract.

The Act of 1805 uses the words " bargain, loan, exchange, " or things bought or sold, forbearance or giving day of pay- " ment," &c., and is much broader and more comprehensive in its terms than the Act of 1818, which is limited to a " loan " or use of money, wares, merchandize, or other commodi- " ty ;" and by the obvious and only fair rule of construction which can be adopted, the words " loan or use " apply to money, goods, wares, merchandize, or other commodity. The words " forbearance or giving day of payment," used in the first Statute (but omitted in the last,) can be applied as well to an absolute sale as to a loan or use. What was the mischief under the old law which was intended to be remedied by the Statute of 1818 ? It was said that capi- talists would not lend their money without an adequate com- pensation ; that from the great activity of business and ra- pidly increasing prosperity of the country at that time, mo- ney was worth much more than the rate of interest as fixed by the Act of 1805. The neighbouring States, *Mississippi* and *Louisiana*, by their laws offered greater encouragement for the loan of money ; and it was feared that much of our monied capital would leave the country if the restriction imposed by the Act of 1805 should not be removed. It was again and again asked, why not permit the holder of money to sell or hire it for the best price it will command— nobody ever thought of restraining the planter in the sale of

his cotton, or the farmer of his grain—why should not contracts for the loan of money be as free and unrestrained? Views of this sort as to the policy of limiting by law the rate of interest for the loan of money, must often have been taken by every one reflecting on the subject. I was a member of the Legislature when the Act of 1818 passed, and was prepared to give it all the support in my power, but it needed none—all appeared to be enamoured with the new (but as the event proved, fearful) experiment, and the Act passed without opposition. Although I cannot now see any objection to it in theory, I readily admit that its effects have have been deleterious in the extreme. Experience often proves that what appeared to be the soundest calculations of the human mind, as to moral causes and effects, are but folly.

The object of the Statute was to remove the restriction from the monied capitalist. He would receive the principal benefit. It was expected that the community at large would be benefited by the employment of money, which would otherwise remain inactive or seek a foreign market. Such were the objects which the Legislature had in view, and reason and the history of the times warrant this conclusion. Is not the Act of 1818 sufficiently broad to effect those objects without enlarging its plain, direct, and obvious meaning? If a contract on its face be a hard one, surely the aid of a liberal construction of the Statute should not be invoked in order to support it.

In most of the contracts in these cases the rate of interest is exorbitant. In some as high as 120 per cent. per annum : can we go beyond the plain literal meaning of the Statute to support such? The terms " *a loan or borrowing*," have an apt, fixed, and certain meaning in common language, and would no more be taken to mean giving day, or credit on an absolute sale of property, than to express any other idea the most foreign to the subject which the mind can conceive. Had it been the intention of the Legislature that the Act of 1818 should embrace giving day, on an absolute sale, to express such intention they would only have had to retain the expressions used in the Act of 1805. An attempt has been made to bring the authority of cases decided under the Statute of Ann to bear on the construction of the Act of 1818. The Statute of Ann had an object in view distinct and different from that for which our Act of 1818 was intended; is expressed in different terms; and by a liberal construction would embrace the giving day or credit on an absolute sale. Its object, like that

29

of our Act of 1805, was to prevent usury, and to guard against hard and unequal bargains.

The English Courts then, properly gave a construction to the English Statute in its most liberal and enlarged sense. But if a loan and a selling are different Acts, by what rule of construction can we say, that in our Statute of 1818 the Legislature intended to include both under the name of one? The expression of the one is the exclusion of the other. Taking into view the object of this Statute, my mind is brought to the conclusion, that to authorize a higher rate of interest than eight per cent. per annum, the consideration must be a fair and bona fide loan, as distinguished from forbearance or giving day, on a contract of sale. To bring a bond or note within the operation of this Statute, is it essential that on its face it should appear that the consideration was a loan? Where a right is derived from a Statute, the party availing himself of such right must strictly conform to the Statute. At Common Law, parties might contract for interest, under certain restrictions, as to its rate; but what was the maximum of interest recoverable is not settled. If the Act of 1818 was only affirmative of the Common Law, the right would be derived from the Common Law and not from the Statute. If this Statute restores only in part a Common Law right, which a previous Statute had taken away, the party claiming the right must shew that he comes within the exceptions which the new Statute has made to the restrictions imposed by the old one. The Act of 1818, in the cases therein enumerated, authorized contracts for interest for an *unlimited* amount, if stipulated between the parties; and in this, gives a new right. It extends only to certain subjects of contract, and does not give a general right. The right then, not being derived from the Common Law, must strictly conform to the Statute from which it originates. This Statute requires that the contract should be in writing. What contract? No other could be meant by the Legislature than that for loan or use. At Common Law, an action would lie on a promise, though not in writing, to pay the debt of another. The Statute of Frauds required that such agreement should be in writing. By the decisions under that Statute, it has been held that by the term agreement is meant not merely the promise, but the consideration on which the minds of both parties were brought to agree; that the consideration, as well as the promise, must be expressed in the writing. Here I think is a strong analogy to the point under consideration. I infer, that for a contract for interest to come within the operation of the first Section of the Statute, the con-

sideration must, in all cases, appear to have been a loan. I am not prepared to say that if there has been a bona fide loan, and the consideration not set forth in the contract as expressed in writing, it could not be shewn by proper averments. It would seem that an averment of the consideration would sufficiently apprize the defendant of the nature and cause of the action to put him on his proper defence. If the consideration was set out in the contract, it would require no other averment to shew it.

As to the question—what is interest, and what penalty?—By the Counsel for the plaintiff in Error it is contended, that a note, payable at a future day, to bear interest from the date if not punctually paid, will not carry the *back interest*—but this in law is a penalty ; and calling it interest will not change its character.

A penalty is an agreement to pay a greater sum to secure the payment of a less sum. It is conditional; and can be avoided by the payment of the less sum before the contingency agreed upon shall happen. It is immaterial by what name it is called. If it accrues in a gross amount on the maturity of the note, it is penalty and not interest. (*Dinsmore* vs. *Hand*, decided here at the last term. (a) *Astley* vs. *Weldon*, 2 Bos. and P. 346.) The nature of interest is absolute and unconditional, to run on a debt due and withheld. It is contended that the case of *Dinsmore* vs. *Hand* was a contract under the Act of 1805, and can have no bearing on these cases—that the Act of 1818 authorizes this stipulation for back interest. I am of opinion, that so far as the contracting parties confine themselves within the rate of interest fixed by law, there is no difference, as to this matter, between the two Statutes. On the principles of the decisions on contracts of this nature, it is a penalty ; no matter whether it be at a rate within the Act of 1805, or contracted for since the passage of the Act of 1818.

As to the 2d, 3d, and 4th classes of cases, as arranged in the brief and arguments of the Counsel for the plaintiffs in Error, I am of opinion, that if the consideration had been a fair and bona fide loan, the parties had a right to stipulate any rate of interest, to run from any given day, without limiting it to a future day or to the maturity of the note ; provided the contract as to the interest be absolute and unconditional.

I am also of opinion, that however unconscientious such contracts may appear to be, a Court of Law can exercise no other controul over them than to confine the parties to the rigid rules of law ; and that the exercise of any other

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

(a) *ante, p.* 126.

JUNE, 1824.
Henry and Winston
v.
Thompson, &c.
&c. &c.

would be an assumption of Legislative powers, and beyond the proper sphere of judicial power.

Judge *Saffold.*—The number of cases depending on the decision to be now made, the variety of the points made in the argument, and the amount in controversy, give more than usual importance to the questions now before us. I approach the subject with a corresponding diffidence.

On the part of the plaintiffs in Error it is contended, that to bring the contracts within the operation of the first Section of the Statute of 1818, entitled " An Act to amend an Act against Usury," the contract must not only be in writing, but on its face must shew that the consideration was a loan of money, that the right to interest is derived solely from the Statute law; and if the contract do not appear as above described, interest is recoverable only at the rate mentioned in the second Section of the Statute,—eight per cent. per annum.

It is also contended, that supposing it unnecessary that the consideration should be shewn in the instrument, yet in most of the cases the agreement to pay the premium was not absolute, but depended on the contingency of failing to make punctual payment of the principal, and must therefore be considered as a penalty; that where the premium or interest, as expressed in the note, is to run until the principal is paid, the reference is to the time limited for payment by the note; or if on the construction of the instrument it is to be inferred that a longer time was intended, the premium is exorbitant and ought to be rejected as unconscionable.

On the part of the defendants in Error most of these positions are controverted, and it is contended that these contracts come within the operation of the first Section of the Statute cited. That all debts carry interest according to its rate as fixed by the law in force at the time of the contract, or by the agreement of the parties within the limits of the law; and that the interest continues to run at such rate until the debt shall be satisfied or merged in a judgment; and that on simple contracts relief against a penalty can be had only in equity.

Although it has been denied by the historian Hume and some others, that interest was allowed by the Common Law, I think it satisfactorily shewn by eminent Jurists (among whom may be mentioned Justice Blackstone and the compilers of Bacon's abridgment) that notwithstanding the doubts and prejudices on this subject prevailing in *England* at different times prior to any Statute concerning it, a moderate rate of interest fairly contracted, for the loan of

JUNE, 1824.

Henry and Winston
v.
Thompson, &c.
&c. &c.

money, was sanctioned and allowed by the Common Law; but if the rate was exorbitant, it was considered usurious and unlawful. By Grotius it is said, " if the compensation al-" lowed by law does not exceed the proportion of the " hazard run, or the want felt by the loan, its allowance is " neither repugnant to the revealed nor the natural law ; but " if it exceed those bounds it is then oppressive usury, and " though the municipal laws may give it impunity, they " can never make it just."

In these cases most of the notes stipulate a premium at the rate of five per cent. a month ; some at a less rate, some at a rate as high as ten per cent. a month, equal to one hundred and twenty per cent. per annum. I am constrained to say that the enormity of these rates must naturally excite an exclamation of astonishment, that they induce a presumption of unfairness ; they exceed any rational estimate of a fair equivalent for the use of money, and are greatly beyond any rates ever sanctioned by the principles of the Common Law. If they can be recovered, it must be by force of the clear and express terms of the Statute, and only in such cases and for such term of time as come within its express provisions.

To bring the contract within the operation of the first Section of the Statute, it is necessary that the premium should be " fairly and bona fide stipulated and agreed upon by the parties to such contract," and either in fact or in legal contemplation for the consideration mentioned in the Statute. Had this been the first Statute in which the terms " loan or use of money, wares, merchandize, or other commodity" were used in relation to interest or usury, or if a more enlarged construction of these terms than their literal import had not already been established, it might well be questioned whether by force of the first Section of the Act of 1818 an exorbitant rate of interest, even for the time while forbearance was agreed on, would be recoverable, unless it be in cases where it was specifically shewn by the written evidence of the contract to be in consideration of the actual loan, use, or hire of the articles mentioned in the Statute. But the English Statutes of Henry 8th, of Elizabeth, and of Ann ; Statutes of Virginia, of Georgia, and our own Act of 1805, all designed to prohibit usury and regulate the rate of interest, have used the same form of expression in describing the consideration of loans. If the Statutes of the other states of the Union on this subject were examined, the same form of expression would probably be found. In most of these Statutes other words are collaterally or incidentally introduced, such as.

" for the forbearance or giving day of payment," &c. and in their penal provisions the terms " bargain, loan, exchange," are used. But as to the right to the interest on a loan, or stipulated forbearance of a debt, these latter clauses could, I apprehend, not be considered as enlarging the description of the contract. I will here observe, that most of these Statutes provide a rate of interest which shall be recoverable from and after the debts shall become due and payable. Our Statute of 1805, which was in force at the enactment of the Statute of 1818, was evidently intended to include all contracts in which interest could be agreed for or usury committed. Yet as to the consideration during the time given for payment, the first Statute uses no language more comprehensive than the last ; but it expressly provides that a certain rate of interest should be allowed and recovered for the time after the maturity of the debt. It is true, that the Act of 1805 in prescribing the remedy against usury says, " if it shall be ascertained by the plea or answer of the " defendant in any such suit that more than the rate of six " dollars, &c. be taken or received in or by any bond or " note whatever, for the payment of any principal or sum of " money, goods, wares, merchandize, commodity, or other " thing whatever bought or sold, no interest or premium " whatever, for forbearance or giving day of payment, shall " be allowed, &c." This is the concluding sentence of the same Section which enumerates the subjects of the contracts by the use of the same terms which have been adopted for the like purpose in the Act of 1818 ; and if to be regarded in the construction of the first Statute, can only be considered as explanatory of the preceding sentence. It is also worthy of consideration, that the Act of 1819 now in force uses substantially the same language in defining the subjects of the contracts on which interest may be taken.

My examination of this matter brings me to the conclusion, that by the uniform construction of the term " loan of money, wares, merchandize, and other commodity," as used in the Statutes of this and other countries to which I have referred, contracts on any valuable consideration for the payment of money at a future day are included. The words " or use" immediately following the word " loan" in our Statute of 1818, have not been used in the other Statutes referred to. As here used they are perhaps insignificant ; but at any rate they do not restrict the meaning of the sentence. If the construction uniformly given to the words " for the loan of money, wares, merchandize, or other commodity," prior to the Statute of 1818 was as I have stated, the same construction must be given to them as used in this

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

Statute. It is a rule of construction warranted by the best reason as well as highest authority, that " words and phrases, " the meaning of which in a Statute has been ascertained, " are, when used in a subsequent Act, to be understood in " the same sense." It is also to be observed that in these notes a premium is stipulated which was allowable only under the Act of 1818 ; and from this it is fairly to be inferred that this Act, and its application to the consideration of the contract, was in the contemplation of the parties when the contract was made. A debt payable at a future day always presupposes a loan ; and " if on a sale the purchase money is " allowed to be retained by the vendee to be paid at a future " time, a debt by that means is created, yet that debt arises " from a supposed lending ; if the transaction be analyzed, it " will be found to be compounded of two distinct contracts : " first, a sale which contrary to the real fact supposes the " purchase money to be paid ; and then a loan by the vendor " to the vendee, the debt is founded on the latter contract." —Ord on Usury, 29. This principle no doubt had its influence in establishing the construction of the Statutes as I have stated. It is only by giving this latitude to the term " loan," that the maxim that " there must be a loan to constitute usury" is verified ; but this liberal interpretation of the term does not extend its application beyond the period limited for forbearance, as I shall attempt in the sequel more fully to shew. If then an agreement to pay a debt in future presupposes a loan, or if the terms of this Statute require the same construction which have been uniformly given to the same terms used in other Statutes enacted for the regulation of contracts of the same description, the first Section of the Act of 1818 includes ordinary contracts for forbearance or giving day of payment ; and it is not necessary that the specific consideration for the interest should appear either in the instrument or in the declaration. But admitting this principle, is the holder of a bond or note entitled to recover any rate of interest or premium stipulated therein, no matter how exorbitant it may be? Can he recover interest for a period as to which *there was no contract for a loan or forbearance ?*

That a premium thus agreed on, (no undue advantage appearing to have been taken) should be recoverable, appears, I admit, plausible in theory ; and as a debtor is at liberty to pay the debt at any time after maturity, and stop the accumulation of interest, it may be said to be his own neglect or misfortune, and he must abide the consequences of his imprudent contract : but it must also be admitted that this doctrine is destructive in practice, and not recognized as applicable to many classes of contracts fully as explicit and much

less grievous than these ; as in deeds of mortgage, agreements for excessive damages, agreements in which there is no mutuality or reciprocity, cases of great inadequacy of price, and many others. Such contracts, in my conception, have a strong analogy to these now under consideration ; and the same inherent principles of justice and equity ought to govern them all.

And if we attach to the term "loan" its most comprehensive signification, it can only apply to a contract for the return or payment of money at a future day, or for the delivery of something for temporary use which is to be returned to the owner. "Forbearance is the giving day for the " return of a loan, or more properly signifies the giving a " further day when the time originally agreed on is passed." Ord, 23. Giving a further day for payment, to constitute forbearance requires, I apprehend, not merely a passive indulgence, but an express agreement to that effect ; and it is to be observed, that the term "forbearance" (could it enlarge the operation of this Statute is not to be found in it,) and is not omitted in any other on the same subject, yet I consider forbearance, when stipulated for, tantamount to a loan.

By what authority then can we extend the operation of the first Section of this Statute to an ordinary debt for which no forbearance has been agreed on ; or, if agreed for, how can the interest for the time subsequent to the stipulated forbearance come within the scope of the first Section ? It is said that all debts carry interest after maturity at the same rate as before. For this principle, so far as it applies to a moderate and reasonable rate of interest, whether fixed by law or by the contract of the parties, the case reported in 4 Johnson's Chancery Reports, 436, is an authority. In that case, the only objection was that the stipulated premium was *too small.* The case cited from 2d Burrow, 1098, only proves that the *lex loci* governed the contract ; but there is not the same authority for scrutinizing contracts in order to enhance as to reduce damages. In an action of debt or assumpsit, to increase the damages beyond the agreement would be unprecedented ; yet it is the daily practice to reduce them. In cases like these, the reason for the difference must be obvious ; for when or where were safeguards necessary to protect a lender from exaction ? When in a state of society like ours has it been unnecessary to provide checks for the protection of the borrower ? He is generally at the mercy of the lender ; the lender never within his power or subject to his exactions. It is mainly for this reason that the Statutes, as well as the judicial deci-

sions of almost every country have gone far to mitigate, but have never interfered to enhance premiums on money. But I have already said that in my opinion the Act of 1818 requires a strict construction. Will it be deemed novel to maintain that a Statute under which for *the detention of money* damages are claimed at a rate, five, nay more than ten times as great as has ever been prescribed by law, or assessed by a Jury in a well regulated community, demands a construction more cautious and strict than an ordinary Statute designed to establish a moderate and uniform rate of interest? Nor can I suppose it necessary at this day to offer argument or authority to prove that which in its nature and character, and according to settled legal principles, is a penalty, must not be so considered because it is called interest in the note. It is immaterial by what name the parties call it. The settled principles for the construction of contracts must determine its true character.

Hence I arrive at the conclusion that by the first Section of this Statute (in many respects peculiar in its phraseology) on the bonds or notes payable at a future day the high rates of interest or premium which were absolutely and unconditionally agreed upon, are recoverable for the time of the loan or stipulated forbearance. The Statute was evidently intended to give *some* latitude to contracts. As to the period of forbearance, the agreement to pay the premium is unequivocal and absolute, not dependant on failing to pay punctually at the appointed day, or on any other contingengency. Thus far there was some degree of mutuality, inasmuch as the borrower had an indefeasible right to retain and use the money during the time of forbearance stipulated; but beyond this time, according to my opinion, the exorbitant premiums do not come within the scope of the first Section; and this equitable construction could have been excluded only by an express provision of the Statute, that any conventional or stipulated rate of interest should continue to run until payment or judgment. The true spirit and design of the Act of 1818 were only to obviate *the objection of usury* to such contracts as, without the aid of this Statute, would have been considered as usurious; and no other modification of the law of contracts was intended to be made by it.

Then if these contracts fully expressed the intention of the parties, (and to claim the protection of the first Section they should be "fairly and bona fide stipulated" in writing,) under the old law such of them only would have been usurious as contain an unconditional agreement for the payment of the premiums for the stipulated time of forbear-

JUNE, 1824.

Henry and Winston

v.

Thompson, &c. &c. &c.

30

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

ance, or were payable on some probable contingency over which the debtor had no control. Under the old law, premiums payable only in the event of failing to make punctual payment of the debt, as in the first class of these cases ; or exorbitant premium or interest not to commence running until after the expiration of the loan, as in the fourth class of cases, would not be considered usurious, yet could not be recovered because they are penalties. The debtors might make punctual payment. The legal presumption is, that the contract will be complied with; and in that event the premiums would never attach. Hawk. P. 6, 245. Bac. Ab. Usury C. Although this Statute purports to sanction usury, I cannot for a moment suppose it was intended to coerce the recovery of penal obligations. The second and third classes of cases are not unlike the other two as to the premium or interest for the time subsequent to the day given for payment. The promise as to this time was not absolute and unequivocal, but depended on the contingency of failing to make punctual payment. It may be fair to presume the debtors contracted under a false confidence in their ability to be punctual, and did not expect to incur the penalty.

Although the entire premiums in the 1st and 4th classes of cases depend on conditions expressed or implied, and in the 2d and 3d classes the interest subsequent to the maturity of the debt depends on the implied condition, yet as the creditors in justice, and by the principles of the Common Law, are entitled to reasonable interest for the detention of the debts ; if the conventional interest were moderate, equitable, and reasonable, it should, I think, be adjudged at the rates fixed by the contracts. But exorbitant as they here are, they cannot be regarded as a measure of the damages for the detention of the debt for a longer period than was unequivocally contracted for ; and for the residue of the time I must look to the second Section of the Statute to ascertain the rate of interest which is to govern.

In further elucidation of the doctrine I have advanced, suppose a chattel to be hired for a short time at a premium for each month equal to one fourth of its value. It is destroyed by negligence or misuser, and the hirer is unable to return it at the time appointed. The owner, several years afterwards, brings his action for the value of the property, together with the stipulated premium, amounting to more than ten times its value ; could it be contended that by the express terms of this Statute, or by any principle of law or justice, he could recover according to this measure of damages ? If not, where is the distinction between the loan or

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

hire of money, and of any other commodity? The case supposed, as well as the cases before us, are stronger, but have a just analogy to the case of *Baxter* and al. vs. *Wates,* 12 Mass. Rep. 366, where the borrower gave his promise in writing to return the animal hired in a year, with $6 in cash, and if not then returned, to pay $6 for each year until delivered. It was held that the promisee was entitled to $6 for one year only, and to legal interest afterwards; that the premium as stipulated for the time beyond the year was equivocal, unconscionable, and void. This decision was upon the principles of the common law, the contract being as much authorized by law as these now under consideration. In Reeves' Domestic Relations, 423, 4, an analogous principle is recognized. It is there said that compound interest appears to be fair, and may be taken annually; but if suffered to accumulate for several years will be denied both at law and in equity. In *Jestons* vs. *Brook,* Cowper, 795, the Court said, that admitting that there was no legal objection to the contract on the ground of usury, because the premium was contingent, yet by enforcing its stipulations the lender would receive an exorbitant premium on his money; therefore the consideration was adjudged inadequate, the bargain unconscionable, and the premium was denied. By the case of the wire drawers, Cowper, 112, 116, which was also relied on in argument, the doctrine of relief, even in Courts of law, against demands not usurious, but exorbitant, is well sustained. There the rate of premium was sanctioned by the common usages of the trade, and was moderate compared with these.

Is a Court of law competent to afford relief in the cases at bar? The actions were all debt or assumpsit on bonds or notes. By our Statute, Laws Ala. 464, it is provided that in all actions on " penal bonds for the payment of money where- " in the plaintiff shall recover, judgment shall be rendered " for no more than the principal and interest due on said " bond." This Statute requires the Courts of Common Law to reject the penal stipulations in the bonds.

Assumpsit being in its nature an equitable action, the plaintiff is entitled to recover only so much as by the ties of natural equity and justice the defendant is bound to pay. Hence it would appear that in either form or for either cause of action the plaintiffs are not entitled to recover penalties or excessive damages, or exorbitant or unconscientious demands.

In a question of this magnitude it is to be regretted that there could not be more unanimity in the Court; yet it is satisfactory to know that in the full Court now present there

JUNE, 1824.

Henry and Win-
ston
v.
Thompson, &c.
&c. &c.

is but one dissenting opinion on a point which I think de-
cisive of the main question of the principle, that these high
rates of interest are not recoverable in any case for the
time after the expiration of the stipulated forbearance.——
The nearest approach to unanimity is on the first class of
cases, where the contracts stipulate a premium on the debt at
the rate of five per cent. a month if not punctually paid.
The opinion of five of the six members of the Court is, that
this rate of premium shall be rejected as well for the time
subsequent as for the time prior to the maturity of the debt.
We are brought to this conclusion by reasons somewhat
different, yet the effect is the same.——If we could give to a
contract of this description the most liberal, and to the
creditor the most favourable construction, and that which
we should be constrained to give if there were no legal ob-
jection to the rate of interest, it would exhibit, when analyzed,
an agreement on the part of the debtor to pay the principal
on a given day ; and should he fail to do so, that he would
also pay interest thereon at this rate from the date to ma-
turity, and at the same rate afterwards until the whole should
be satisfied.    If we reject the back interest as penalty on
the ground of contingency merely, by what authority other
than its exorbitancy, consideration, uncertainty, &c. (apply-
ing equally to the other classes of cases) do we reject the
conventional interest that would accrue subsequent to the
maturity.    It was no less the intention of the parties in the
1st class of contracts that the stipulated interest should run
after the maturity of the debts if not paid than in any of
the other cases.    My concurrence on this point is founded
as to the back interest on the contingency, and as to the
interest subsequent to maturity on the same reasons which
govern my opinion in all the other cases ; that there was no
loan, no agreement for forbearance, no sufficient mutuality or
reciprocity ; that the premiums were exorbitant, equivocal,
and unconscionable, and do not come within the operation of
the first Section of the Statute.

The result of my opinion is, that in all cases where there
is an unconditional agreement for the payment of the pre-
mium or interest at a stipulated rate, and prior to the ma-
turity of the debt, it carries interest at that rate until ma-
turity ; but that in all the cases interest for the time sub-
sequent to the maturity of the debt is recoverable only at
the rate prescribed by the second Section of the Statute,
eight per cent. per annum.

Judge *Crenshaw* delivered his opinion on the points
arising on the Record in the case of *Henry* and *Winston* vs.

*Thompson.* The principles of the opinion were equally applicable to all the other cases.

In this case, the declaration in substance states that on the 22d of *May*, 1818, the defendants made and delivered to the plaintiff their note in writing for the payment of $625, 6 months after date, and if not punctually paid to carry five per cent. a month interest until paid, for value received. The Circuit Court overruled the defendant's demurrer to the declaration, and rendered judgment for the principal and interest thereon at the rate of five per cent. a month, from the date of the note until the time of the judgment. The defendants, (plaintiffs in Error) here assign as errors,

1st. That the declaration does not allege that the contract was made fairly and bona fide.

2d. The stipulation to pay 5 per cent. per month interest, if not punctually paid, was a . penalty, and the judgment should have been for the principal and interest at 8 per cent. per annum.

By the Act of *March*, 1805, the rate of interest was fixed at 6 per cent. per annum ; but by the Act of *February*, 1818, " any rate of interest or premium, fairly and bona fide stipulated and agreed upon by the parties to such contract, " expressed in writing and signed by the party to be charged therewith," was made legal and recoverable ; and in all contracts ascertaining the sum due when no specific rate of interest was expressed, it was to be recovered and allowed at the rate of 8 per cent. per annum—this contract was made while this Statute was in force, and its operation on the rights of the parties is now to be considered.

As to the first assignment, if by the expression " fairly and bona fide," the Legislature intended to create any new right, or to superinduce any new quality of property, which was not essential to the validity of all contracts, then perhaps the omission of the averment might be fatal. When a new right unknown to the common law is given by Statute, it must be so averred in the declaration as to bring it within the meaning of the Statute. But by this expression the Legislature intended nothing more than what was an essential ingredient to the validity of every contract, for no contract is good and effectual unless it be fairly and bona fide made, that is, with a full understanding of its subject matter, nature, and terms, without fraud, deceit, or circumvention on the one part, and with view of performing what is agreed to be done on the other. If these words were rejected from the Statute, the sense would still be the same ; they would be as strongly and necessarily implied as they are in all valid contracts. The express averment then that the

JUNE, 1824.

Henry and Win-
ston
v.
Thompson, &c.
&c. &c.

contract was fairly and bona fide made was, in my opinion, no more necessary in this declaration than in a declaration on any other contract.

As to the other assignment, which is principally relied on, and in the discription of which much ability and learning has been displayed by the eminent Counsel on both sides, it must depend on the sound construction of the Act of 1818.

In my researches I have not been able to discover that any rate of interest was fixed by the common law; but in accordance with the principles of natural law the doctrine was, that if the compensation agreed to be given for the use or hire of money was not beyond proportion to the risk of losing the sum lent, and the want and inconvenience occasioned by the loan, it was not malum in se, and was therefore lawful; but if it exceeded these bounds it was considered exorbitant and usurious. The first English Statute on the subject was that of Henry 8th, which confined the rate of interest to ten per cent. Our Statute of 1805 declared it unlawful to receive more than six per cent. per annum, but left the contract in other respects unimpaired. The principal was recoverable, and the interest alone was forfeited. But our Statute of 1818 repeated the prohibitory part of the former Statute, fixed the common standard at eight per cent., and declared lawful any rate of interest or premium however exorbitant, or how much soever it might exceed the common standard, provided it was expressly stipulated and agreed on in writing signed by the party to be charged. Statutes should be expounded so as to effect the object intended by the Legislature. The manifest object of the Legislature in the enactment of this Statute, was to remove some of the restrictions as to interest, and to permit the parties to agree on the rate by mutual consent, provided the rate so agreed upon was expressed in the contract, and that in writing signed by the party to be charged. From a careful examination of the Statute it will be seen that the primary object of the Legislature was not so much that the whole contract should be in writing, as that the premium or rate of interest should be in writing; and that the only reason for requiring this to be in writing was that there might be no doubt or uncertainty as to the rate of interest agreed upon by the parties. I have already shewn, as I think, that it was not necessary to aver in the declaration that the contract was fairly and bona fide made; and the same reason more forcibly proves that it was not necessary to be so expressed on the face of the contract. The Court is not to require more to be in writing than is so expressly required by the Statute. It is not necessary that the consideration.

JUNE, 1824.

Henry and Winston
v.
Thompson, &c.
&c. &c.

or that it was for the loan or use of money, &c. should be expressed in the contract, for this is not required by the Statute. By the second Section of the Act of 1818, where no specific premium or rate of interest is expressed, interest shall be recovered and allowed at the rate of eight per cent. per annum. This is a clear intimation that the parties shall be governed, by any rate of interest that is expressed in writing in any contract without regard to its nature or consideration. This Section, taken in connection with the first, and with the reference to the old law intended to be repealed, shews the intention of the Legislature to permit the parties, in all contracts which would carry interest by operation of law, to stipulate for their own rate of interest, either for the actual loan of money, or any commodity, a debt due, or any other consideration. I am therefore of opinion that it was not necessary that it should appear either on the face of the note or in the declaration that the contract was fair and bona fide, or for the loan or use of money or of any other commodity.

Again, it has been contended on the one hand, that the agreement to pay interest at this rate was a penalty intended to secure and hasten the payment of the principal; while on the other it has been denominated damages stipulated by the parties to be paid if the principal should not be punctually paid. I consider it perfectly immaterial whether it is penalty or stipulated damages. If it is such a contract as comes within the provisions of the first Section of the Act of 1818, any technical name by which it may be called cannot alter its nature or take it out of the Statute. It is yet a rate of interest stipulated and agreed upon by the parties. If the Statute had never existed, and the word "interest" meant penalty, as it has been said, then it might be important to distinguish more precisely between penalty and stipulated damages. The intention of the parties, as collected from the face of the instrument, ought to prevail. Men do not ordinarily use the word interest to convey the idea of a penalty. If a penalty were intended, why did not the parties use that word? Can it be supposed, that by fixing on a high rate of interest they did not intend that it, as well as the principal, should be paid? As a penalty, it could answer no efficient purpose, and might as well have been omitted. Without it, the makers of the note would have been bound to pay the principal and interest at eight per cent. Were it material to distinguish between penalty and stipulated damages, I know of no other rule for the distinction than the intention of the parties apparent on the face of the instrument. If it appear that they intended a penalty, the

JUNE, 1824.

Henry and Win-
ston
v.
Thompson, &c.
&c. &c.

Court should so consider it ; and if it appear that they intended stipulated damages, their intention must govern. It has been said, that this contract is unconscionable, and that the consideration is inadequate to support the promise. I am not able to ascertain from the Record what was the value or proper rate for the hire of money at the time when the contract was made ; for aught I know, it was worth the premium stipulated by the parties. The value of money fluctuates with the price of produce, and many other circumstances which affect the commercial world. Courts of Justice sometimes relieve against unconscionable contracts, and where the consideration is grossly inadequate ; but this is on the supposition that fraud has been practised in obtaining the contract, as where a cunning, artful man has taken an unfair advantage of the weakness, ignorance, or extreme necessity of the other party ; but these circumstances are to be considered as matters *en pais,* susceptible of proof, and not to be inferred merely from the seeming inadequacy of consideration as it appears on the face of the contract. As the case is now presented, I do not think that this Court has any thing to do with the conscientiousness of the contract, or with the adequacy or inadequacy of its consideration. Our Statute is a peculiar one, and was certainly intended to admit men to agree on any rate of interest, however enormous, without regard to the conscience of the parties or the adequacy of the consideration, provided they complied with the requisites of the Statute. It is the duty of Courts to give effect to the law according to the intention and meaning of the Legislature, and to give effect to contracts according to the intention and meaning of the parties. If this contract does not express a premium or rate of interest stipulated and agreed upon by the parties within the provisions of the Statute, I know not what words would constitute such agreement or stipulation. It appears to me a strange interpretation, to say that the parties, in expressing one thing meant another—that they did not mean interest, although that is the word used in the written instrument. If they intended any thing else than the rate of interest agreed upon, why did they not so express themselves in their contract ? I cannot explain away the law on the contract, because the law may be impolitic and the contract a hard one. If they are plain to my mind, it is not my duty to clothe their sense in mystery. In the construction of a law, a Court of Justice should never resort to its policy, unless when the law in itself is extremely doubtful.

But the argument *al inconvenienti* operates more in support of, than against this contract. It is convenient that

men should be held to their contracts, and extremely incon-
venient that they should be impaired or rescinded. The
spirit of the law is to uphold contracts, and presume in their
favour until the contrary is made to appear. It is better to
submit to an obnoxious law for a season, than to evade it
by annuling contracts and prostrating the best principles of
jurisprudence. The monster, with heart of flint and claws
of iron, as the Counsel for the plaintiffs in Error in the
glow of feeling and imagination have depicted the usurer,
had the sanction of the law for his actings and doings, and
none but the Legislative authority is competent to alter the
law.

In the cases to be settled by the present decision, some
of the notes are drawn to carry interest from the date—
some to carry interest from the date, if not punctually paid
—some to bear interest without any reference to time—
and some to carry interest from the time the note is due
till paid. Nice distinctions have been made between these
different classes of notes; some of them have been consi-
dered as coming within the provisions of the Statute, and
others not. In my opinion, it is immaterial what language
the parties use in expressing the rate of interest; whether
the instruments express that the interest is to run from the
date or to commence at a future period—whether the agree-
ment to pay interest be absolute, or dependant on failing to
pay the principal when due. In all the cases, as appears to
me, it is equally a rate of interest, stipulated and agreed up-
on by the parties, and completely within the spirit and mean-
ing of the Statute.

It is said that the Statute did not intend to make legal
any contract which would have been usurious at common
law. I am not certain that usury was an offence by the
common law, at least the evidence of this is vague and in-
definite, but admit that it was an offence clearly defined by
the law. This Statute makes that *lawful* which by the com-
mon law was an offence. It makes any rate lawful which
might be agreed upon by the parties and expressed in writ-
ing.

I regret that, without disregarding what I conceive to be
the best rules of construction, and clearest principles of law,
I could not come to a different conclusion, for I am dispos-
ed to believe that these contracts may operate hardly if not
oppressively; but it is not my province to legislate. In my
judgment I am bound not to violate, but to declare what I
believe to be the law. I cannot intrude on and assume the
powers of another department of the government, whose
acts and authority I am bound to respect and support. The

31.

Legislature have already expressed their disapprobation of
the Statute in question, by repealing it at their first Session
after its enactment. It is my duty to declare the law ac-
cording to the best of my understanding; in doing which I
am constrained to think that the judgments should be affirm-
ed.

As to the case of *Dinsmore* vs. *Hand,* the note in that
case was treated as a sealed instrument, and was given pri-
or to the Statute of 1818. The decision in that case does
not, as I conceive, settle any of the principles involved in
these cases.

Judge *Minor.*—These cases have collectively been brought
before the Court under circumstances which appear to re-
quire my opinion on the principles involved. If it could in-
fluence the decision, it would of course not be applied to
any of the cases in which I appeared as Counsel in the
Courts below.

As to the first class of cases—I will consider the points
as they arise in the Record, in the case of *Harris* and others
vs. *Morrow.* This was an action of debt, on a bond of
plaintiff's to defendant in Error, dated 1st *February,* 1819,
for payment of $125, one year after date; and, if not then
paid, to bear interest from the date at 25 per cent. per an-
num. On the 28th *March,* 1821, the Circuit Court render-
ed final judgment by default, for the debt, and $67 70 as
interest from the date. Is the agreement to pay interest
from the date to be considered as a penalty? It seems dif-
ficult to define the precise line of distinction between pe-
nalty and stipulated damages. The cases on this head do
not appear to be reconcileable. In the case of *Dinsmore*
vs. *Hand,* (*a*) which was debt on a sealed instrument pay-
able at a future day, and if not punctually paid, to carry in-
terest from the date, this court determined that the agree-
ment to pay interest from the date was a penalty. I see
no reason to disturb the principles of that decision. The
Act of *February,* 1818, does not seem to me to affect this
question. In *Dinsmore* vs. *Hand,* the rate of interest was
not beyond the limits fixed by law. The nature of the
agreement, and not the form of the security, must deter-
mine whether it be penal or not. It seems to be immate-
rial whether the agreement be by a sealed or an unsealed
instrument. 2 Bos. and P. 346—354. 2d Com. Con. 524,
&c. An agreement to pay a larger, in order to secure a
smaller, sum, must always be considered a penalty. Here
the direct object of the parties was the payment of $125,
one year after date. If the contract had been to pay
$156 25 on the day after the bond became due in case of

(a) *ante*, 126.

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

failing to pay at the day, there can be no doubt but the *$156 25* must be considered as a penalty. Yet this would be the sum due on it if paid on the day after it became due, according to a literal construction of its terms. Contracts to increase the rate of interest in case of failing to pay at the appointed time, though the increased rate be within the limits fixed by law, appear to have been held to be penal. (*b*) It appears to me, then, that the agreement here to pay interest from the date is to be considered as a penalty, and not as a part of the contract, which expresses what was directly stipulated and agreed upon by the parties, and that there is no operative part of the contract bringing it within the scope of the 1st Section of the Act of 1818 ; that the interest must be recovered and allowed according to the 2d Section : and that the judgment should be reversed and rendered here accordingly. In considering the 2d, 3d, and 4th classes of cases, as arranged in the argument, it is necessary to enquire, to what description of contracts does the Act of 1818 extend ?

Words and phrases, whose meaning in a Statute has been ascertained, when used in a subsequent Statute, are to be understood in the same sense. So words, whose meaning is well known at common law, when used in a Statute, are to be understood according to their ascertained meaning at common law. These are well settled, I may say, self-evident principles of construction. For the Legislature, when about to alter the law, must be presumed to consider the import and effect of the old law to be amended, and of the new law to be enacted. The Act of *February*, 1818, was, as appears by its title, intended to amend the Act of 1805. In this last mentioned Act, the contracts on which the rate of interest is fixed and restrained, are thus described : " For the loan of any money, wares, merchandize, or other commodity." In the several parts of this Act, the terms " *loan and forbearance*" appear to be used as of the same import. So in the *English Statutes, and those of the States* of this Union which I have had an opportunity of examining, the term *loan* appears to be always used as including all contracts in which the rate of interest was limited, and taking a higher rate made penal. See Stat. 37. H. 8, C. 9. 13 Eliz. C. 8. 21 Jac. I. C. 17. 12 Car. C. 13. 12 Ann, C. 16. Stat. of Virginia, 1 Hen. Stat. at large, 102. 1 Revised Code, 1819, 174. Law of Mass. 138. Laws N. C. Laws Ky. Laws of Ga. In the decisions on these Statutes it seems to have been uniformly held, that they extend to contracts for forbearance , or giving further day for the payment of pre-existing debts, as much as to contracts for loan, strictly speaking. In Ord on Usury, and the cases

(*b*) See 2d *Vernon*, 209—306. 3 *Atk.* 520.

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

there cited, it is said, " if there be a pre-existing debt, the " forbearance of it may be usurious. It is nothing more " than lending the money for further time. So, if on a sale " the money is retained by the vender, it is a supposed lend- " ing, subject to the laws against Uusury." In 1 Vesey, p. 530, Ld. Commissioner Eyre says, " Usury is taking more " than the law allows for a loan, or, as I read it, the forbear- " ance of a debt." In *Watkins* vs. *Taylor*, 2d Munford, 428, the President of the Court says; " an agreement for " forbearance of a debt due, in consideration of receiving " at a future day a higher premium or greater emolument " than legal interest, is *clearly* usury." The judicial opinions given in 1 Hen. and Mun. 4—4. H. and M. 223; 4, 90. 2 Mun. 429. 4 Mun. 243—6. Cranch, 253, are to the same effect.

By our Act of 1819, (Laws Ala. 444;) no person shall, upon any contract for the *loan* of any money, &c., take above the value of eight dollars for the forbearance of one hundred dollars for one year ; and all bonds, &c., on which a higher rate of interest is received or taken, shall be utterly void. I presume that it cannot be contended that this Statute does not render void bonds, &c., made after its enactment for pre-existing debts, in which a higher rate of interest than eight per cent. per annum is stipulated, though not for a loan ; or that to bring a contract within the Act, the interest must actually be received.

But the terms of the 1st Section of the Act of *February*, 1818, leave no room for doubt on my mind, as to the description of contracts to which it applies. Its title shews, that in its enactment, the Legislature had the Act of 1805 in view ; and they have adopted terms to express their intention more comprehensive than those used in most of the Statutes to which I have referred. " Any rate of interest " or premium for the loan or use of money, wares, merchan- " dize, or other commodity," &c., " shall be legal and re- " coverable." Does not the forbearance of a pre-existing debt give further use of the money ? Can any one read the sentence, and understand by it that the term *use* is applicable only to *wares, merchandize, or other commodity*, and not to *money* ?—that what is here meant, is the loan of money, and the use of *wares, merchandize, &c.* ?—or that both the terms loan and use do not alike extend to all the enumerated subjects ? By the 2d Section of the Act, " on " all contracts, written or verbal, where no specific rate of " interest or premium is expressed, interest shall be taken; " recovered, and allowed, at the rate of eight per cent. per " annum." If it was the intention of the Legislature to confine the operation of the first Section within the limits *now*

JUNE, 1824.

Henry and Winston
v.
Thompson, &c.
&c. &c.

contended for, why has it been declared in the second in such general terms that on all contracts where no specific rate of interest is expressed interest shall be recovered at the rate of eight per cent. ? If it was intended that a higher rate of interest should not be recovered on any contract for payment of money not founded on an actual loan, would not the second Section have expressed, in terms less doubtful, that on contracts ascertaining the sum due, and not being for money lent, &c. interest should be allowed at this rate ? Would not the subjects of the contracts on which any rate of interest to be agreed upon was made legal and recoverable, have been defined in terms very different from those used in the first Section ?

The history of the country has been adverted to as aiding in the construction of this Statute. It has been said, that at the time of its enactment great encouragement was offered for the loan of money · by the laws of the neighbouring States of *Mississippi* and *Louisiana*—that it was apprehended that if the restrictions imposed by the Act of 1805 were not removed, much of the monied capital of this State would leave it for a better market—that the rapidly advancing prosperity of the country afforded a prospect for the employment of money with great profit, and to the general benefit of the community—that the object of the Act of 1818 was to increase the facilities for borrowing money, and not to let creditors loose to contract for interest without limit on debts already due. From the same history, we learn that the opinion was about this time gaining ground that all laws limiting the rate of interest were impolitic, and tended to defeat their own object, to increase, instead of lessening the interest to be paid by those who wanted money. Whether this, as a general proposition, be correct or not, I am not prepared to say. All must admit that this opinion, in producing the Act of 1818, was highly disastrous in its consequences to a considerable portion of the people of this State. The history of the country, as well as the title of the Act, induce me to think that the restraints imposed by the Act of 1805 on contracts for interest was the supposed mischief which the Act of 1818 was intended to remedy. Why should the restrictions be removed in cases of loan only, and continued on all other contracts ? To one disposed to give a high interest for money under an expectation of a greater profit from its use, or under the pressure of great necessity, it could make little difference whether the money was retained by a new contract with his creditor or borrowed of another ; and had it been generally understood (as it is now said is to be understood from a proper construction of the Statute,) that a legal contract for a high-

JUNE, 1824.

Henry and Win-
ston
v.
Thompson, &c.
&c. &c.

er rate of interest than eight per cent. could be made only in consideration of an actual loan, it is obvious that the only, or the general effect of such a construction of the law on the community would have been to produce contracts for the loan of money to satisfy the pressing demands of creditors, instead of contracts with the creditors for further forbearance.

But the terms of the Statute seem to me to leave no room to resort to the supposed object of the Legislature in its enactment in order to give it a proper construction. It is said, that the right to make contracts of this description originates with the Statute. That the Statute requires the contract to be in writing, and that by analogy to the principles applicable to the Statute of Frauds, the consideration, being a part of the contract, must be expressed in writing. The Statute of Frauds requires that the agreements within its provisions shall be in writing, and enacts that if not in writing no action shall be brought on them. Our Statute of 1818, as I read it, requires that the rate of interest stipulated and agreed upon by the parties to the contract, shall be expressed in writing, and the writing signed by the party to be charged. The second Section of the Statute directs, that on all contracts where no specific rate of interest is *expressed*, interest shall be allowed at eight per cent. Had it been the intention of the Legislature to confine contracts of this description to cases of loan, and to require that the consideration should be expressed in the written contract, they could not have been at a loss for words to manifest such intention with clearness and precision. What matter or right has its origin in this Statute ? Not the right to contract for the payment of money, or for the payment of interest, but the right to contract for interest exceeding eight per cent. per annum. To recover interest exceeding this rate, it must be averred that the rate was expressed in writing ; but I cannot perceive why it should be necessary that more than this should be so averred, for all the other matter of the contract is good without the aid of the Statute. 6 Bac. Ab. 383, 395. I am satisfied (by reasons which need not be here repeated,) that a contract for interest was good at common law. The Statutes on the subject have for the most part restrained and not given the right to make such contracts. That if the rate of interest be fairly and bona fide stipulated and agreed upon by the parties expressed in writing, and the writing signed by the party to be charged, the Statute makes it legal and recoverable, whether the consideration be a loan of money or other commodity, or the use of money by giving further forbearance for a pre-existing debt —this Court has heretofore decided (a) that the writing

(a) *Allen* vs.
*Dickson, ante,*
119.

which is the foundation of the action, whether it be under seal or not, must be received as evidence of the debt or duty ; and that it is not necessary to aver or prove the consideration.

JUNE, 1824.

Henry and Winston
v.
Thompson, &c. &c. &c.

I have not been able to perceive the force of the objection 'that by the Records it is not averred that the rate of interest was fairly and bona fide stipulated. Every contract is to be presumed to have been fair and bona fide until the contrary appear ; to presume that it was obtained by fraud, or attended with other circumstances rendering it null, would at least be novel. Full effect will I think be given to these terms in the Statute, when we consider the strong and comprehensive terms by which any rate of interest is made legal and recoverable. I infer that the framers of the Statute, by requiring that the rate of interest should be fairly and bona fide stipulated, and that no bona fide contract should be vacated or in any manner impaired by reason of any premium or rate of interest, intended to obviate any doubts which might arise as to the power and control of Courts of Justice over contracts for interest which might not be fair and bona fide. And if this averment had been made in the declaration, I cannot perceive but that the same presumption must have attached to the contract, and the same and no greater range for defence have been left open to the other party as there would have been without it.

It is said that for the time after the maturity of the notes which were payable at a future day, and in the cases in which the notes were payable at their dates, there is no contract for forbearance, and no consideration to support the agreement for the interest specified ; and that therefore the stipulated rate must govern only for the period of forbearance as expressed in the notes ; and that from the time when they became due, the interest, according to the second Section of the Statute, must be at eight per cent. per annum.

If the parties had agreed for less than eight per cent., there could be little hesitation in concluding that the rate fixed by the contract must govern up to the time of the judgment ; and so I think it must here, as in all other cases where the rate agreed does not exceed the limits prescribed by law. 2 Burrow, 1098. 4 John. 436. It is further said, that these high rates of interest, from their very enormity, are to be considered but as penalty ; and that this is more particularly the case as to the notes on which the stipulated interest was to run only from maturity, as in these it accrued only on the condition of failing to pay at maturity. But if this renders it a penalty, interest on every debt to be

paid at a future day is as much so, and the contract of the parties as to it must be disregarded; and yet the Statute unequivocally makes the contract of the parties the standard. It is true these rates are enormous, very greatly beyond what any prudent man would contract for, and must naturally excite commiseration for the misfortunes and imprudence of those who made such contracts. Their hardship and oppression, and their ruinous consequences to a large portion of the community, have in the argument been spoken of with much feeling; but a Court of Justice is required to enforce contracts, and not authorized to relieve the parties from the consequences of their own imprudence. It is the law and not the feelings or wishes of those who may administer it which must govern. The questions presented by the Records lead not to the enquiry, whether there are any equitable circumstances entitling the plaintiffs in Error to relief, but to the examination of the legal construction of their contracts. These, in all but the first class of cases, appear to me to be direct and unequivocal as to the rates of interest expressed; and it as clearly appears that the Statute authorized such contracts, and made them legal and recoverable, and that it is not within the scope of judicial power to declare that they were illegal and shall not be recovered.

In the duties which I have to perform here, I am required to be uninfluenced by sympathy for any whom the operation of the laws of the country has involved in distress; and according to the best lights I can obtain to express my opinion on the abstract propositions presented. I am of opinion, that all the contracts under consideration but those of the first class, are within the operation of the first Section of the Statute of *February*, 1818; that the parties were authorised to contract for interest at the rates expressed; that the interest so stipulated was made legal and recoverable; and that in the second, third, and fourth classes of cases, the judgments should be affirmed.

Judges *Ellis* and *Gayle* concurred with the Chief Justice in the opinion that the Statute requires that the contract on its face should shew that the consideration was a loan. Judge *Gayle* also concurred with Judge *Saffold* in the opinion that where the rates of interest were exorbitant, and there was no time of forbearance fixed by the contracts, they were not within the operation of the first Section of the Act of 1818. As to this last matter Judge *Ellis* gave no opinion. The written opinions of Judges *Ellis* and *Gayle* cannot now be found among the files of the Supreme Court.